# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTONIO IBARRA-BARAJAS, | CASE NO. 1:09-cv-01734-SMS |
| Plaintiff, | |
| v. | ORDER REMANDING CASE FOR FURTHER DEVELOPMENT OF THE RECORD |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

Plaintiff Antonio Ibarra-Barajas, proceeding *in forma pauperis*, by his attorney, Christenson Law Firm, seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits under Title II, and for supplemental security income ("SSI") under Title XVI, of the Social Security Act (42 U.S.C. § 301 *et seq.*) (the "Act"). The matter is currently before the Court on the parties' cross-briefs, which were submitted, without oral argument, to the Honorable Sandra M. Snyder, United States Magistrate Judge.[1]

Having reviewed the complete record and applicable law, this Court finds that the Administrative Law Judge ("ALJ") erred both in completely rejecting the opinion of Plaintiff's treating physician and in failing to order supplementation of the record through examination and testing by a consultant physician. As a result, the ALJ's opinion of Plaintiff's residual functional capacity ("RFC"), which was based solely on the conclusory opinions of non-examining agency

---

[1] Both parties consented to the jurisdiction of a United States Magistrate Judge (Docs. 3 & 11).

1

physicians, was not supported by substantial evidence.  Accordingly, the Court reverses the agency's determination and remands Plaintiff's application for disability benefits to the agency for development of a record adequate to support a grant or denial of benefits to Plaintiff.

I.     **Administrative Record**

   A.     **Procedural History**

On October 31, 2006, Plaintiff filed protectively for a period of disability and disability insurance benefits.  AR 13.  His claims were initially denied on March 14, 2007, and upon reconsideration, on September 12, 2007.  AR 13.  On October 15, 2007, Plaintiff filed a timely request for a hearing.  AR 13.   Plaintiff appeared and testified at a hearing on January 28, 2009.  AR 26-33.  On April 16, 2009, Administrative Law Judge Christopher Larsen ("ALJ") denied Plaintiff's application.  AR 13-19.  The Appeals Council denied review on July 31, 2009.  AR 1-3.  On September 23, 2009, Plaintiff filed a complaint seeking this Court's review (Doc. 1).

   B.     **Agency Record**

**Plaintiff's testimony.**  Plaintiff (born December 9, 1955), a former farm worker, cannot read or write English.  AR 27.  His only education consisted of attending the first grade while living in Mexico.  AR  26-27.  He worked picking fruit until he became ill, could not breathe, and was hospitalized.  AR 27-28.

Plaintiff rents a room from relatives.  AR 30.  He cooks and cleans for himself.  AR 30.  He can drive for about an hour before needing to stop and rest.  AR 30.

Plaintiff now has continual problems breathing.  AR 28.  When he walks "a little bit," he experiences pain and cannot breathe.  AR 28.  Plaintiff also becomes breathless when he tries to clean his room or encounters such things as smog, sprays, perfume, or cooking odors.  AR 28.

His condition was treated with several inhalers, which helped Plaintiff.  AR 28.  Nonetheless, he had attacks of breathing difficulty every two or three days, in which he felt as though he was choking for fifteen or sixteen minutes.  AR 28-29.  His inhalers helped relieve his breathlessness but caused headaches.  AR 29, 32.  He visited the doctor every three months to renew the medications.  AR 29.

///

Although he could lift and carry fifty pounds, he could not sustain that work for more than twenty or thirty minutes. AR 30-31. He could lift and carry fifteen to twenty pounds for two to three hours a day. AR 31. He could stand for about an hour at a time; sit, for an hour and a half to two hours. AR 31. He needed hourly rest breaks of twenty to thirty-five minutes. AR 31.

Plaintiff experienced some days that were far worse than others. AR 31. Both hot and cold weather exacerbated his breathing difficulties. AR 32. Going outside in winter caused pain in his lungs. AR 31-32. In the summer, he needed to stay in the shade. AR 32.

**Daily activities questionnaire.** In a daily activities questionnaire dated November 20, 2006, Plaintiff reported that, because of the shortness of breath caused by his chronic asthma, he "felt bad all the time." AR 125. Walking a block left him breathless. AR 125. He was unable to lift or carry anything. AR 126. He could drive his manual car for about 15 minutes. AR 126. Tasks that used to be easy made him feel bad. AR 127. Cold and dirt made him cough; even the bed covers hurt. AR 127. He slept about five hours daily, but his asthma disturbed his sleep. AR 127. His medications included an albuterol inhaler, prednisone tablets, and an Advair inhaler. AR 127.

**Adult disability report.** Plaintiff reported that he could not speak, read, write, or understand English. AR 128. His preferred language was Spanish. AR 128.

Plaintiff was first bothered by breathing problems on April 1, 2001. AR 129. He became unable to work on October 30, 2005. Walking and even speaking caused shortness of breath. AR 129. Symptoms worsened in cold weather. AR 129.

Plaintiff had previously worked ten hours a day picking fruits and vegetables. AR 130. He lifted as many as eighty pounds at a time. AR 130.

**Hospital admission (AR 176-238).** On April 17, 2006, Plaintiff, who was in respiratory failure, was admitted to Sierra View District Hospital, where he remained until April 25, 2006, initially maintained on a ventilator. Upon admission, Christopher Kolker, M.D., diagnosed pulmonary insufficiency, acute respiratory failure, obstructive chronic bronchitis, acidosis, pneumonia, hypotassemia, and renal and urethral infections. X-rays revealed marked Chronic

Obstructive Pulmonary Disease ("COPD").[2] Upon discharge, the respiratory failure was resolved, the COPD had improved, the pneumonia remained, and the hypokalemia was resolved.

**Emergency room treatment (AR 168-175).** On June 4, 2006, Plaintiff was treated in the emergency room of Sierra View District Hospital for breathing pain. The admitting doctor's impression was asthma and COPD. The treating physician prescribed prednisone, an atrovent inhaler, and an albuterol inhaler.

**Porterville Health Center (AR 242-246).** Multiple doctors and physicians' assistants at Porterville Health Center followed Plaintiff after his April 2006 hospitalization and June 2006 emergency room treatment. The doctors consistently diagnosed COPD. Several noted that Plaintiff had stopped smoking following his hospital admission.

**Porterville Family Health Care (AR 250-276, 290-318, 323-341, 343-352, 354-356, 358-361).** Reynaldo Garcia, M.D., of Porterville Family Health Care, appears to have been Plaintiff's primary physician. On April 17, 2006, Garcia treated Plaintiff with an albuterol nebulizer and supplementary oxygen after identifying an exacerbation of Plaintiff's asthma during an office examination at which Plaintiff was anxious and gasping for breath. When Plaintiff's breathing did not improve, Garcia sent Plaintiff to Sierra View District Hospital by ambulance.

At a follow-up appointment on April 28, 2006, Garcia noted that Plaintiff was clinically improved from the respiratory failure that had resulted in his hospitalization. His coughing was reduced, although he had a "fine expiratory wheeze." Plaintiff was then tapering from his prednisone (steroid) treatment begun in the hospital and using Advair Discus 250/50 and Atrovent/albuterol inhalation. Garcia recommended that Plaintiff not return to work for two

///

---

[2] "Chronic Obstructive Pulmonary Disease, or COPD, is a common, serious condition affecting the lungs and airways, producing chronic cough and shortness of breath. It is most often seen in people who are middle-aged or older. COPD is actually made up of two separate disease processes–emphysema (which destroys the lung tissue itself, where oxygen is taken up and carbon dioxide eliminated, and causes shortness of breath) and chronic bronchitis (which inflames and weakens the conducting airways within the lung, and causes cough and sputum production). Many people with COPD also have some aspects of asthma." David J. Pierson, M.D., Lung Care and Lung Transplantation Services Chronic Obstructive Pulmonary Disease (COPD), uwmedicine.washington.edu/ Patient-Care/Our-Services/Medical-Services/Lung-Care/Pages/ArticleView.aspx?subId=336 (January 12, 2011).

4

months to allow time for recovery from his hospital admission for COPD.  He contemplated that Plaintiff might be able to return to work part time after recovery.

When Plaintiff saw Garcia on September 5, 2006, he was using only albuterol inhalation and was experiencing breathing problems, particularly at night.  Garcia noted reduced air entry in both lung fields.  Garcia gave Plaintiff a sample Advair/Diskus 100/50 to use once or twice a day.

Plaintiff's breathing was better at his appointment on November 28, 2006.  Plaintiff's COPD was stable at his appointments with Garcia on January 17, and March 12, 2007.

Following Plaintiff's April 13, 2007 appointment, Garcia noted that Plaintiff's condition had recently worsened, and he had run out of medication.  Plaintiff was experiencing shortness of breath, a fever, and nasal congestion.  His chest and lungs were tight with fine wheezing.  Although Plaintiff was able to purchase sudafed and albuterol, Garcia provided him with sufficient samples of Advair Diskus 250/50 to last until his next appointment.

On June 15, 2007, Garcia assessed Plaintiff as "doing well."  Garcia noted that, because Plaintiff could not afford his prescriptions, he was giving Plaintiff sample medications.  Because the clinic did not then have any samples of Advair, Garcia substituted QVAR and Proventil.

On August 14, 2007, Garcia noted that Plaintiff's asthma was "moderately persistent."  Because Plaintiff's breathing and coughing dramatically improved with medication, Garcia continued to give Plaintiff sample medications.

In a letter written "To Whom It May Concern," dated October 2, 2007, Garcia wrote:

> Antonio Ibarra, DOB:12/09/1955, is my patient in Family Healthcare Network in Porterville, California.  He has uncontrolled asthma/chronic obstructive pulmonary disease.  He is dependent on sample medications to control his symptoms, due to financial constraints.  I saw him for a follow-up visit on September 28, 2007, and his illness is getting worse.

AR 323.

Following the November 19, 2007 appointment, Garcia noted that Plaintiff was doing well with medications of Advair and albuterol.  At that appointment, Plaintiff complained of chest discomfort.

///

In a letter written "To Whom It May Concern," dated January 8, 2008, Garcia wrote:

> Antonio Ibarra, DOB:12/09/1955, is my patient in Family Healthcare Network in Porterville, California. He has uncontrolled asthma/chronic obstructive pulmonary disease. His illness is getting worse. He is dependent on sample medications to control his symptoms, due to financial constraints. During his last visit, I advised him to rest indefinitely until his symptoms are resolved.

AR 349.

On January 14, and April 4, 2008, Garcia examined Plaintiff and reported that he was doing well with Advair and Proventil.

Plaintiff saw Anthony Capili, M.D., on June 16, 2008. On August 22, 2008, Garcia examined Plaintiff and reported "fair air entry" and "no wheezing." On October 24, 2008, Garcia again described Plaintiff's asthma as "moderately persistent."

**Pulmonary Function Testing (AR 277-280).** On January 26, 2007, Plaintiff was evaluated at the pulmonary function laboratory of the Kaweah Delta Health Care District. Plaintiff's efforts were maximal for interpretation. Plaintiff's FEV1 (Forced Expiratory Volume in 1 second) was 2.50; his FVC (forced vital capacity: the amount of air expelled from one breath) was 3.63; and the FEV1/FVC ratio was 64 per cent.[3] Plaintiff demonstrated significant improvement with bronchodilators.

**Garcia's Residual Functional Analysis (AR 363-367).** Garcia reported that he saw Plaintiff for a follow-up visit every two months. He diagnosed Plaintiff as having asthma and COPD, as evidenced by shortness of breath, difficulty breathing, and chronic cough. Plaintiff's symptoms included shortness of breath, chest tightness, wheezing, episodic acute asthma, episodic acute bronchitis, fatigue, and coughing. Plaintiff experienced asthma attacks every two to three days, precipitated by upper respiratory infection, cold air, and changes in the weather.

In Garcia's opinion, Plaintiff was not a malingerer, and his impairments were reasonably consistent with his symptoms. Plaintiff's prognosis was poor. His symptoms were sufficiently severe to frequently interfere with attention and concentration. He was capable of low stress jobs.

---

[3] COPD is diagnosed when the FEV1/FVC ratio falls below seventy percent. *See* en.wikipedia.org/wiki/FEV1/FVC_ratio (January 12, 2011).

6

According to Garcia, Plaintiff could walk about one block without rest; sit for two hours at a time; stand for 45 minutes at a time; and sit or stand/walk less than two hours in an eight-hour working day. He could lift fifty pounds rarely; twenty pounds occasionally; and less than ten pounds frequently. He could occasionally stoop and climb ladders, and frequently twist, crouch, and climb stairs. Plaintiff would need a fifteen-minute break every two hours. Plaintiff should avoid even moderate exposure to extreme cold, extreme heat, high humidity, cigarette smoke, soldering fluxes, solvents/cleaners, and chemicals. He should avoid all exposure to fumes, odors, dusts, gases, and perfumes. Plaintiff was subject to good days and bad days, and was likely to miss more than four days of work each month.

**Agency's Case and Residual Functional Capacity Analysis (AR 281-287, 319-320).** On March 9, 2007, C.E. Lopez, M.D., reviewed the record for the agency and concluded that Plaintiff's allegations were not fully credible. Lopez recommended unlimited exertional criteria with environmental limitations on fumes, odors, dusts, gases, and poor ventilation. On September 12, 2007, E.A. Fonte updated the analysis with no changes.

**Vocational expert.** Vocational expert Thomas Dachelet testified that Plaintiff could not perform his previous job as a farm worker. AR 34. For the first hypothetical, the ALJ asked Dachelet to assume a worker of Plaintiff's age, education, and work experience, whose only limitation was the need to avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. AR 34. Dachelet testified that Plaintiff could perform the full range of light and sedentary unskilled work as well as some jobs at the medium level. AR 34. According to Dachelet, 827,554 persons are employed at the light unskilled level in California. AR 34.

For the second hypothetical, the ALJ directed Dachelet to consider a worker of Plaintiff's age, education, and work experience who could stand and walk less than two hours in an eight-hour work day, and who could sit less than two hours in an eight-hour work day. AR 34. Dachelet confirmed the ALJ's assumption that no such jobs are available. AR 34.

Finally, Plaintiff's attorney asked Dachelet whether Plaintiff could perform his past work if he needed to rest for ten minutes every hour. AR 35. Dachelet opined that no such positions exist. AR 35.

## II.   Discussion

### A.   Legal Standards

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability. 20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f). The process requires consideration of the following questions:

> Step one:    Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
>
> Step two:    Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
>
> Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
>
> Step four:   Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five:   Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since October 30, 2005, the alleged onset date. AR 15. His severe impairments were asthma and chronic obstructive pulmonary disease. AR 15. Neither of these impairments met or medically exceeded one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix I (20 C.F.R. 404.1525,

404.1526, 416.925, and 416.926.  Plaintiff was unable to perform his past work.  AR 17.  Plaintiff had the residual functional capacity to work at all exertional levels but needed to avoid concentrated exposure to fumes, dusts, odors, gases, and poor ventilation.  AR 16.

### B. Scope of Review

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper legal standards, and if the ALJ's findings are supported by substantial evidence.  *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).

### C. Plaintiff's Claims

Plaintiff questions the ALJ's determination that he is capable of work at all exertional levels, pointing out that Dachelet's testimony did not support that finding and that, if the "grids" (20 C.F.R. Pt. 404, Subpt. P., App. 2, § 201.09 and 202.09) are applied, given Plaintiff's age, inability to communicate in English, and limited education, he is presumed disabled if he is limited to light or sedentary work.  Plaintiff contends that the ALJ erred in adopting the opinion of agency reviewers, who never examined Plaintiff, over the opinion of his treating physician, and in dismissing Plaintiff's testimony as not credible.

#### 1. Credibility of Treating Physician

The regulations provide that medical opinions be evaluated by considering (1) the

examining relationship; (2) the treatment relationship, including (a) the length of the treatment relationship or frequency of examination, and the (b) nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors that support or contradict a medical opinion. 28 C.F.R. § 404.1527(d).  Three types of physicians may offer opinions in social security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant (nonexamining physicians)." *Lester*, 81 F.3d at 830.

A treating physician's opinion is generally entitled to more weight that the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a non-examining physician. *Id.*  The Social Security Administration favors the opinion of a treating physician over that of a nontreating physician. 20 C.F.R. § 404.1527; *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007).  A treating physician is employed to cure and has a greater opportunity to know and observe the patient. *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987).

"If a treating physician's opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record, [it will be given] controlling weight.'" *Orn*, 495 F.3d at 631, *quoting* 20 C.F.R. § 404.1527.  Finding Garcia's letters and RFC evaluation to be inconsistent with his treatment notes, the ALJ rejected Garcia's evaluation of Plaintiff's residual functional capacity:

> [Plaintiff's] treating physician, Dr. Garcia, concluded [Plaintiff] can lift and carry 50 pounds rarely, 20 pounds occasionally, and less than 10 pounds frequently; stand and walk for less than 2 hours, and sit for less than 2 hours, in an 8-hour workday; frequently climb stairs, but only occasionally stoop, bend, or climb ladders, ropes, or scaffolds.  Dr. Garcia further concluded [Plaintiff] must avoid even moderate exposure to extreme cold, extreme heat, high humidity, cigarette smoke, soldering fluxes, solvents, cleaners, and chemicals, and avoid all exposure to fumes, odors, dusts, gases, and perfume (Exhibit 14F, pp. 4, 5).  He also concluded [Plaintiff] would likely be absent from work four days per month (Exhibit 14F, p. 6).
>
> I give Dr. Garcia's opinion little weight because it is inconsistent with his own treating record.  Dr. Garcia himself reported [Plaintiff] was doing well on his medication on most visits to his office (Exhibits 3F, p.9; 7F, pp. 4, 5, 6; 8F, pp. 3, 4; 11F, p. 8).  In the letters, Dr. Garcia stated [Plaintiff's] illness was worsening

10

      and that his asthma and COPD were not controlled. However, records from January 14, 2008, recite [Plaintiff's] illness is "well-controlled," and records from November 19, 2007, recite [Plaintiff] "is still doing well with medications . . ." (Exhibit 11F, pp. 6, 9). These inconsistencies tend to show Dr. Garcia's opinion is not fully credible.

AR 17.

Accordingly, the ALJ rejected Garcia's opinions regarding Plaintiff's residual functional capacity.

Whether Garcia's to-whom-it-may-concern letters are actually inconsistent with his treatment notes is unclear to this Court. Following Plaintiff's respiratory failure and hospital stay, Garcia prescribed two months' complete rest, anticipating that, if Plaintiff recovered well, Plaintiff might be able to work part time. Given Garcia's low expectations, his notes that Plaintiff was "doing well" are inherently ambiguous. A physician could well believe that a chronically ill patient was doing well in managing his medication or in controlling the symptoms of his illness, even if the patient was not doing well in an absolute sense. Statements such as "doing well with medication," are susceptible to multiple meanings, possibly indicating, among other things, that a patient is able to recognize when medication, such as a rescue inhaler, is appropriately used, or that the patient is able to regulate dosages in response to symptoms of varying intensity. Similarly, characterizing a chronic illness as "well-controlled" may indicate nothing more than that the patient is managing his condition as well as may be expected in light of the severity of the illness and available treatments and medications.

In particular, the ALJ's opinion did not discuss the language of Garcia's letters. Garcia wrote that Plaintiff had "uncontrolled asthma/chronic obstructive pulmonary disease," and that the "sample medications . . . control[led] his symptoms." AR 323, 349. The ALJ's decision did not address the distinction between uncontrolled chronic disease and control of the symptoms caused by the disease. Because he was reviewing only Garcia's written materials, the ALJ was unable to question Garcia to clarify his intended meanings and to assess fully his credibility. The ALJ did not otherwise request that Garcia clarify his opinions.

In Social Security Ruling 96-2p, the Agency explained 20 C.F.R. § 404.1527:

    [A] finding that a treating source medical opinion is not well-supported by

11

>medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527. . . . In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

S.S.R. 96-2p at 4 (Cum. Ed. 1996), 61 Fed.Reg. 34,490, 34,491 (July 2, 1996).

By summarily rejecting Garcia's opinion, the ALJ erred.  After rejecting Garcia's opinion, the ALJ was left with no evidence other than Lopez's and Fonte's opinions, both of which presumably were based on Plaintiff's medical records since the agency record includes no other evidence that could have served as a basis, and Dachelet's testimony, which did not support a finding that Plaintiff was able to perform work at all exertional levels.

Once a claimant establishes that he or she cannot perform past relevant work, the burden of proof shifts to the Commissioner to establish that the claimant can perform other work. *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995), *cert. denied*, 417 U.S. 1122 (1996).  "The Secretary can carry this burden by propounding to a vocational expert a hypothetical that reflects all the claimant's limitations." *Id.*  The ALJ here never propounded a hypothetical setting forth all of Plaintiff's limitations.

Neither Lopez nor Fonte examined Plaintiff.  "The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician." *Lester*, 81 F.3d at 831.  The Commissioner may only reject the opinion of a treating or examining physician, based in part on the opinion of a non-examining doctor, if additional evidence also conflicts with the treating or examining physician's opinion. *Id.  See, e.g., Roberts*, 66 F.3d at 184 (An ALJ is justified in rejecting examining physician's opinion where overwhelming weight of other evidence supported the ALJ's conclusion); *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995) (ALJ's rejection of the opinion of the examining psychologist was appropriate where that opinion conflicted with the opinions of five non-examining mental health professionals, medical reports in the record, and the claimant's own testimony); *Magallanes v. Bowen*, 881 F.2d 747,  751-55 (9th Cir. 1989) (The ALJ properly rejected opinion of treating physicians where ALJ's decision was supported by

laboratory test results, contrary reports of examining physicians, and testimony from claimant that contradicted the treating physician's opinion).

Opinions of nontreating physicians are only substantial evidence when they are supported by independent clinical findings and objective tests. *Magallanes*, 881 F.2d at 751. "Independent clinical findings can be either (1) diagnoses that differ from those offered by another physician and that are supported by substantial evidence, or (2) findings based on objective medical tests that the treating physician has not herself considered." *Orn*, 495 F.3d at 632 (*citations omitted*). Here, there are no independent clinical findings or objective tests.

When all examining doctors in a prior case agreed that the claimant's condition resulted in constant, severe pain, the Ninth Circuit Court of Appeals held that the ALJ erred in rejecting the findings of the examining doctors in favor of the report of a non-treating, non-examining physician who concluded that claimant's pain did not preclude substantial gainful activity. *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984). The ALJ made the same error here.

The inadequacy of the evidence supporting the ALJ's opinion is magnified by the agency's failure to secure an independent assessment of Plaintiff's condition by an examining consultant physician. If the ALJ found Garcia's treatment notes inconsistent with his opinions, he should have requested supplementary testing and examination. An ALJ "is not a mere umpire at [the administrative hearing], but has an independent duty to fully develop the record." *Higbee v. Sullivan*, 975 F.2d 558, 561 (9th Cir. 1992). He or she must "fully and fairly develop the record and . . . assure that the claimant's interests are considered.'" *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001), *quoting Smolen v. Chater,* 80 F.3d 1273, 1288 (9th Cir. 1996), and *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983). Ambiguous evidence or a finding that the record is inadequate to allow proper evaluation triggers the ALJ's duty to initiate an appropriate inquiry, continuing the hearing if necessary. *Smolen*, 80 F.3d at 1288; *Armstrong v. Commissioner of Social Security Admin.*, 160 F.3d 587, 590 (9th Cir. 1998).

Because of Plaintiff's illiteracy and inability to communicate in English, the ALJ's duty to develop the record fully was arguably heightened. *Compare Higbee*, 975 F.2d at 562. Once the ALJ determined that Garcia's opinion was unreliable and that the agency had not developed

sufficient evidence to carry its burden of proof at step five, he was required to "conduct an appropriate inquiry" to determine Plaintiff's residual functional capacity. *See Tonapetyan*, 242 F.3d at 1150; *Armstrong*, 160 F.3d at 590; *Smolen*, 80 F.3d at 1288. The ALJ failed to do so. Accordingly, this Court will remand this case for development of an adequate record on the question of Plaintiff's residual functional capacity in light of his serious impairments of asthma and COPD.

### 2. **Plaintiff's Credibility**

Plaintiff contends that, having rejected the opinions of his treating physician, the ALJ wrongly determined that Plaintiff's testimony was not supported by medical evidence. Remarkably, the ALJ stated:

> After careful consideration of the evidence, I find [Plaintiff''s] medically-determinable impairments can reasonably be expected to produce his alleged symptoms. But his statements about the intensity, persistence, and limiting effects of those symptoms are not credible *to the extent they are inconsistent with my assessment of his residual functional capacity.*

AR 16 (*emphasis added*).

An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional requirement. *Orn*, 495 F.3d at 635, *quoting Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). But if he or she decides to reject a claimant's testimony after a medical impairment has been established, the ALJ must make specific findings assessing the credibility of the claimant's subjective complaints. *Ceguerra v. Secretary of Health and Human Services*, 933 F.2d 735, 738 (9th Cir. 1991). "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834, *quoting Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988). He or she must set forth specific reasons for rejecting the claim, explaining why the testimony is unpersuasive. *Orn*, 495 F.3d at 635. *See also Robbins v. Social Security Administration*, 466 F.3d 880, 885 (9th Cir. 2006). The credibility findings must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

When weighing a claimant's credibility, the ALJ may consider the claimant's reputation

for truthfulness, inconsistencies in claimant's testimony or between his or her testimony and conduct, claimant's daily activities, claimant's work record, and testimony from physicians and third parties about the nature, severity and effect of claimant's claimed symptoms. *Light v. Social Security Administration*, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may consider "(1) ordinary techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008), *citing Smolen*, 80 F.3d at 1273.

The Ninth Circuit has summarized the applicable standard:

> [T]o discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide "'specific cogent reasons for the disbelief.'" *Morgan*, 169 F.3d [595,] 599 [9th Cir. 1999] (quoting *Lester*, 81 F.3d at 834). The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." *Id.* Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing." *Id.* Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony . . . An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules. *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, . . . and are to be relied upon as precedent in adjudicating cases."); *see Daniels v. Apfel*, 154 F.3d 1129, 1131 (10th Cir. 1998) (concluding the ALJ's decision at step three of the disability determination was contrary to agency rulings and therefore warranted remand). Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Fair*, 885 F.2d at 603; *see also Thomas*, 278 F.3d at 958-59.

*Orn*, 495 F.3d at 635.

An ALJ may not disregard a claimant's testimony solely because objective medical evidence does not fully substantiate it. *Robbins*, 466 F.3d at 883. Unless the ALJ finds that affirmative evidence demonstrates that the claimant is a malingerer, he or she can only find the claimant's testimony not credible by making specific findings of credibility and supporting each such finding with clear and convincing evidence. *Id.* In this case, without any findings supporting his conclusion, the ALJ candidly rejected Plaintiff's testimony *to the extent it was*

*inconsistent with his assessment of Plaintiff's residual functional capacity.*  The ALJ erred.  On remand, the ALJ is directed to consider Plaintiff's testimony in light of legally applicable standards.

### III.  Conclusion and Remand

"The court shall have the power to enter, upon pleadings and transcript of record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  In social security cases, the decision to remand to the Commissioner to award benefits is within the court's discretion.  *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989).  If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded.

Accordingly, this Court orders that the administrative determination be REMANDED for development of an adequate record relating to the consequences of Plaintiff's asthma and COPD on his residual functional capacity and rehearing in light of that record.  The Clerk of Court is hereby directed to ENTER JUDGMENT in favor of Plaintiff Antonio Ibarra-Barajas and against Defendant Michael J. Astrue, Commissioner of Social Security.

IT IS SO ORDERED.

**Dated:   January 27, 2011**              /s/ Sandra M. Snyder
                                                        UNITED STATES MAGISTRATE JUDGE